# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00273-CV

**Texas Bankers Association, Finance Commission of Texas, and Credit Union Commission of Texas// Association of Community Organizations for Reform Now (ACORN), Valerie Norwood, Elsie Shows, MaryAnn Robles-Valdez, Bobby Martin, Pamela Cooper, and Carlos Rivas, Appellants// Cross-Appellants**

**v.**

**Association of Community Organizations for Reform Now (ACORN), Valerie Norwood, Elsie Shows, MaryAnn Robles-Valdez, Bobby Martin, Pamela Cooper, and Carlos Rivas// Texas Bankers Association, Finance Commission of Texas, and Credit Union Commission of Texas, Appellees// Cross-Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. D-1-GN-04-000269, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

The Association of Community Organizations for Reform Now (ACORN) and a number of individuals who took out home equity loans in Texas filed suit against the Finance Commission of Texas and the Credit Union Commission of Texas (collectively, the Commissions), seeking to invalidate certain regulations adopted by the Commissions in relation to home equity lending.[1] *See* Tex. Gov't Code Ann. § 2001.038 (West 2008) (allowing declaratory-judgment actions to challenge validity of regulation). The Texas Bankers Association (TBA) intervened,

---

[1] Because the appellants' interests do not diverge in this appeal, we will refer to them collectively as ACORN.

arguing that the interpretations were a proper exercise of the Commissions' authority. Both sides filed motions for summary judgment, and the trial court granted each motion in part, invalidating seven of the nine challenged regulations. TBA and the Commissions appealed, arguing that the trial court erred in invalidating four of the regulations.[2] ACORN cross-appealed, contending that the trial court erred in refusing to invalidate the remaining two regulations. The trial court's judgment was stayed pending resolution of this appeal. We affirm the trial court's judgment in part and reverse and render in part.[3]

## BACKGROUND

In 1997, Texas voters approved an amendment to the Homestead Provision of the Texas Constitution, *see* Tex. Const. art. XVI, § 50, making Texas the last state in the nation to allow homeowners to borrow against their home equity. *Id.* § 50(a)(6); *see also LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) ("For over 175 years, Texas has carefully protected the family homestead from foreclosure by limiting the types of liens that can be placed upon homestead property. Texas became the last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997.").

The Texas Constitution was amended again in 2003 to authorize the legislature to delegate the authority to issue interpretations of the home equity lending provisions:

---

[2] The Commissions repealed the other three invalidated regulations.

[3] ACORN's motion for leave to file a supplemental letter brief is hereby granted.

2

The legislature may by statute delegate to one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is:

> (1)    in effect at the time of the act or omission; and

> (2)    made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.

*Id.* § 50(u). Pursuant to this amendment, the legislature delegated interpretive authority over the home equity provisions to the Commissions, *see* Tex. Fin. Code Ann. §§ 11.308, 15.413 (West Supp. 2008), and the Commissions in turn adopted a number of regulations interpreting the home equity provisions, *see* 7 Tex. Admin. Code §§ 153.1-.96 (2009) (Joint Fin. Regulatory Agencies, Home Equity Lending).[4] The Commissions' interpretations are subject to review under the Administrative Procedure Act (APA). *See* Tex. Fin. Code Ann. §§ 11.308, 15.413; *see also* Tex. Gov't Code Ann. § 2001.038.

ACORN filed suit against the Commissions under the APA, seeking to invalidate nine of the Commissions' regulations, and TBA intervened in support of upholding the regulations. ACORN argued that the regulations either contradicted the plain meaning and intent of the constitutional provisions or represented new rules that the Commissions had no authority to enact. The trial court granted summary judgment, invalidating seven of the challenged regulations and determining that the remaining two were valid. This appeal and cross-appeal followed.

---

[4] We will hereinafter refer to the Commissions' interpretations as "Rules 153.1-.96." Where necessary, we will refer to amended regulations as either the current or former rule.

**STANDARD OF REVIEW**

Summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, both parties move for summary judgment on the same issues, and the trial court grants one motion and denies the other, the appellate court considers the summary-judgment evidence presented by both sides, determines all questions presented, and if the reviewing court finds that the trial court erred, renders the judgment the trial court should have rendered. *Id.*

"The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038. Because section 2001.038 of the APA does not prescribe a standard of review, the Texas Supreme Court has held that "[j]udicial review of rules is thus largely unlimited in . . . scope." *Railroad Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 75 (Tex. 2003).

The parties disagree on the level of deference to be afforded to the Commissions' interpretations of the home equity provisions of the constitution. Typically, "[c]onstruction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993). The guidelines applicable to the construction of statutes are equally applicable to the construction of the Texas Constitution. *See Rooms With a View, Inc. v. Private Nat'l Mortgage Ass'n*, 7 S.W.3d 840, 844 (Tex. App.—Austin 1999, pet. denied). ACORN argues, however, that the constitution and the finance code provide the

4

Commissions with only a limited grant of interpretive authority, as opposed to the broader type of enforcement authority that warrants deference to an agency's interpretation. *See* Tex. Const. art. XVI, § 50(u) (authorizing legislature to delegate to agencies "the power to interpret" home equity provisions of constitution); Tex. Fin. Code Ann. §§ 11.308, 15.413 (providing that Commissions may issue interpretations of home equity provisions). On that basis, ACORN contends that the Commissions' interpretations are entitled to little or no deference. We disagree with ACORN's contention that the power to interpret portions of the constitution is necessarily a more narrow grant of authority than a state agency's enforcement power over matters within its jurisdiction. In expressly delegating interpretive authority over the constitution to state agencies, the legislature must have intended to afford the resulting interpretations at least the same level of deference given to an agency's interpretation of a statute it is charged to enforce. As a result, we will defer to the Commissions' interpretations unless they are unreasonable or contrary to the plain language of the constitution. *See Moore*, 845 S.W.2d at 823.

We must presume "that the language of the Texas Constitution is carefully selected," and "construe its words as they are generally understood." *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). We must also "strive to give constitutional provisions the effect their makers and adopters intended." *Doody v. Ameriquest Mortgage Co.*, 49 S.W.3d 342, 344 (Tex. 2001).

## DISCUSSION

*Cap on Fees Other Than Interest*

In their first issue on appeal, the Commissions and TBA argue that the trial court erred in invalidating the Commissions' interpretation of the meaning of "interest" for purposes of

5

the cap on fees other than interest in the context of a home equity loan. Section 50(a)(6)(E) of article 16 of the Texas Constitution states that the only permissible type of home equity loan is one that:

> does not require the owner or the owner's spouse to pay, *in addition to any interest*, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit.

Tex. Const. art. XVI, § 50(a)(6)(E) (emphasis added).

This provision limits fees, other than interest, to three percent of the principal amount of the loan. In Rule 153.1(11), the Commissions defined "interest" for purposes of this fee cap as "[i]nterest as defined in the Texas Finance Code § 301.002(4) [sic] and as interpreted by the courts." Rule 153.1(11). Section 301.002(a)(4) of the finance code, located in the subtitle governing usury, defines interest as "compensation for the use, forbearance, or detention of money." Tex. Fin. Code Ann. § 301.002(a)(4) (West 2006).[5] The Commissions further clarified their interpretation of the meaning of "interest" in Rule 153.5(3), stating, "Charges an owner or an owner's spouse is required

---

[5] More specifically, section 301.002(a) states, "[in] this subtitle . . . 'interest' means compensation for the use, forebearance, or detention of money." Tex. Fin. Code Ann. § 301.002(a) (West 2006). The referenced subtitle is subtitle A, Interest, of Title 4, Regulation of Interest, Loans, and Financed Transactions, which generally governs usury and sets maximum interest rates for certain transactions. *See id.* §§ 301.001-339.005 (West 2006 & Supp. 2009). Subtitle A contains general definitions in chapter 301, *see id.* §§ 301.001-.002, generally prohibits the charging of usurious interest in chapter 302, *id.* §§ 302.001-.104, imposes contract interest rate ceilings in chapter 303, *id.* §§ 303.001-.502 , sets maximum rates of judgment interest and limits circumstances in which judgment interest may be imposed in chapter 304, *id.* §§ 304.001-.302, imposes liability, penalties, and remedies for usurious interest in chapter 305, *id.* §§ 305.001-.105, and regulates commercial loans, including maximum interest rates and methods of calculating whether interest in a commercial loan is usurious, in chapter 306, *id.* §§ 306.001-.103. The remaining chapters of the subtitle govern collateral protection insurance, deceptive advertising, and credit card transactions, with minimal references to interest. *See id.* §§ 307.001-339.005.

to pay that constitute interest under the law, for example per diem interest and points, are not fees subject to the three percent limitation." Rule 153.5(3).[6]

ACORN argues that the commonly understood meaning of "interest" is not the broad definition found in the usury statutes, but the amount of interest described in the promissory note and specified as a percentage rate to be applied to the remaining, unpaid principal. ACORN further contends that the Commissions' interpretation of "interest" encompasses all fees paid to the lender and therefore allows the "interest" exception to swallow the rule limiting fees to three percent of the principal.

TBA and the Commissions argue that the usury definition of interest found in the finance code may reasonably be applied to the constitutional language capping fees "in addition to any interest" because the legislature is presumed to act with complete knowledge of the existing condition of the law and with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). However, the usury provisions of the finance code were enacted "to protect the citizens of Texas from abusive and deceptive practices now being perpetrated by unscrupulous operators, lenders and vendors in both cash and credit consumer transactions . . . and thus serve the public interest of the people of this State." *George A. Fuller Co. v. Carpet Co.*, 823 S.W.2d 603, 604 (Tex. 1992) (quoting Act of May 4, 1967, 60th Leg., R.S., ch. 274, § 1, 1967 Tex. Gen. Laws 608, 609); *see also Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 500 (Tex. 1979)

---

[6] In keeping with its ruling that the Commissions' definition of interest is invalid, the trial court invalidated subsections (4), (6), (8), (9), and (12) of Rule 153.5, because each of these subsections adopts the term "interest" as defined in Rules 153.1(11) and 153.5(3). The Commissions concede that if Rules 153.1(11) and 153.5(3) are invalid, then subsections (4), (6), (8), (9), and (12) of Rule 153.5 are invalid as well. Accordingly, we will limit our review to the validity of Rules 153.1(11) and 153.5(3).

(Spears, J., dissenting) (stating that purpose behind "labels rule," which states that labels assigned to charge are not determinative in determining whether it is interest, "is to prevent a lender from collecting usurious interest by labeling the charge something other than interest"). Given the inherent differences between the consumer-protection mechanisms of the usury statutes, which require a broad definition of interest, and the protective purposes of the home equity fee cap, use of the usury definition of interest for purposes of the fee cap fails to preserve the legislative intent.[7]

The Commissions further argue that the finance code's definition of interest represents a technical meaning of the word "interest," and that we must construe the interest exception to the fee cap accordingly. *See* Tex. Gov't Code Ann. § 311.011(b) (West 2005) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 464 (Tex. 2009) ("The Legislature often supplies its own dictionary, and where it provides a precise definition, courts must honor that substituted meaning."). The finance code definition of interest, however, represents the technical definition of interest only as it applies in the usury context, pursuant to the intent to protect borrowers from usurious lending practices.[8] In the home equity

---

[7] The parties do not dispute that the home equity provisions were drafted with an intent to protect consumers. As TBA acknowledges in its brief, the home equity provisions of the constitution include so many protective measures that "the end result is a home equity lending scheme more stringent than any other in the United States in terms of consumer protection." *See also Herman Iken & Co. v. Olenick*, 42 Tex. 195, 198 (1874) ("The leading and fundamental idea connected with a homestead is unquestionably associated with that of a place of residence for the family, where the independence and security of a home may be enjoyed, without danger of its loss, or harassment and disturbance by reason of the improvidence or misfortune of the head or any other member of the family.")

[8] The finance code definition of interest was created pursuant to section 11 of article 16 of the Texas Constitution, which provides that "[t]he Legislature shall have authority to define interest

8

lending context, incorporating the extremely broad usury definition of interest would defeat the purpose of the constitutional provision imposing a fee cap in the first place. "[C]onstitutional provisions should not be given a technical construction which would defeat their purpose." *Cramer v. Sheppard*, 167 S.W.2d 147, 154 (Tex. 1942).

ACORN points to the required consumer disclosure notice set forth in section 50(g), which includes the following language: "FEES AND CHARGES TO MAKE THE LOAN MAY NOT EXCEED 3 PERCENT OF THE LOAN AMOUNT." Tex. Const. art. XVI, § 50(g). According to ACORN, this language is indicative of the legislature's intent to include fees imposed by the lender in the fee cap. We note that language included in the required notice is not necessarily dispositive, as the notice language in section 50(g) also includes the following statement: "THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE." *Id.*; *see also Stringer v. Cendant Mortgage Co.*,

---

and fix maximum rates of interest." Tex. Const. art. XVI, § 11. Section 11 is titled, "Usury; Rate of Interest in Absence of Legislation," and as the supreme court pointed out in *Sage Street Associates v. Northdale Construction Co.*, 863 S.W.2d 438, 439 (Tex. 1993), was enacted "for effective regulation of commercial lending" in response to a historical "period of lending abuse." *See also id.* at 439 n.1 ("During the Constitutional Convention of 1875, this provision was referred to as 'the section which provides for usury laws.' *There is no indication that the framers intended the section to govern anything but commercial usury*.") (internal citation omitted) (emphasis added).

Like section 11 governing usury, the home equity provisions of the constitutions were enacted to regulate commercial lending and prevent credit abuses. However, the definition of interest included in the usury provisions of the finance code, enacted pursuant to the grant of authority in section 11 and applicable only to usury, plays a much different role in the regulation of commercial lending than interest as defined for purposes of the home equity fee cap. As such, section 11 does not preclude a determination that application of the usury definition of interest to the fee cap is inconsistent with the home equity provisions of the constitution.

9

23 S.W.3d 353, 357 (Tex. 2000) ("[S]ection 50(g)'s notice provisions do not independently establish rights or obligations for the extension of credit."). However, we agree that the notice language does at least indicate that the legislature considered the three-percent fee cap to be a substantive protection afforded to borrowers. Allowing the interest exception to swallow the rule would strip the home equity provisions of this intended protection.

In interpreting the fee cap provision of the constitution, "we rely heavily on its literal text and must give effect to its plain language." *Doody*, 49 S.W.3d at 344. The plain language of this provision creates a three-percent cap on fees other than interest in the context of a home equity loan. *See* Tex. Const. art. XVI, § 50(a)(6)(E). The Commissions' interpretation, which classifies fees charged by the lender as interest, essentially renders this cap meaningless.[9] We cannot conclude that the legislature, in creating the cap on fees connected with a home equity loan, intended to exclude basically all fees charged by the lender from the cap. *See Spradlin*, 34 S.W.3d at 580 ("We avoid constructions that would render any constitutional provision meaningless or nugatory."). Even applying a deferential standard of review, the Commissions' definition of interest is contrary to the intent and plain meaning of the constitution. As a result, we affirm that portion of the trial court's judgment invalidating Rules 153.1(11), 153.5(3), (4), (6), (8), (9), and (12).[10]

---

[9] At the summary-judgment hearing, the Commissions acknowledged that any fee paid to a lender, other than amounts simply reimbursing the lender for charges paid to a third party or amounts, such as an application fee, that are charged for a "distinct service," would constitute interest under the usury definition and would not be subject to the cap. When the trial court expressed concern that such a broad definition would allow an origination fee, for example, to be classified as interest, the Commissions confirmed that such a charge would not be subject to the fee cap as long as it is paid to the lender.

[10] The parties disagree on whether specific types of "points," such as "origination points" paid to originate the loan, should qualify as interest or fees for purposes of the fee cap. ACORN does, however, concede in its reply brief that true "discount points," charged by the lender in

*Oral Loan Applications*

In their second issue on appeal, the Commissions and TBA argue that the trial court erred in invalidating a portion of Rule 153.12(2), interpreting section 50(a)(6)(M)(i) of the Texas Constitution. At the time summary judgment was rendered, section 50(a)(6)(M)(i) stated that a home equity loan may not be closed before "the 12th day after the later of the date that the owner of the homestead submits an application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section." Tex. Const. art. XVI, § 50(a)(6)(M)(i) (amended 2007). Under this provision, a home equity loan could not be closed until the conclusion of a 12-day waiting period, beginning on the date an application is submitted or the date the owner receives the required consumer disclosure, whichever is later. *Id.* The Commissions' regulation states that for purposes of triggering this 12-day waiting period, "[a] loan application may be given orally or electronically." Rule 153.12(2). The trial court invalidated that portion of the rule allowing oral applications to trigger the waiting period and preserved that portion of the rule allowing electronic applications.

ACORN argues that allowing an oral application to trigger the waiting period is inconsistent with the level of formality that the legislature intended to inject into the home equity lending system for the purpose of protecting consumers. TBA and the Commissions, on the other

exchange for a lower interest rate, should qualify as interest. At any rate, the only question properly before us in this appeal is whether the trial court erred in invalidating the Commissions' regulations as being inconsistent with the plain language of the constitution. Having determined that it did not, we are not in the position to provide a substitute definition of interest or to definitively categorize "discount points," "origination points," or any other charges that might be imposed by a lender as either "interest" or "fees." While the Commissions' current definition of interest is invalid because its breadth eviscerates the constitutionally mandated three-percent cap on fees, the Commissions are free to adopt another definition of interest that is consistent with the plain language of the constitution.

hand, assert that it is not uncommon for lenders to accept oral applications from prospective borrowers by taking information over the telephone, and further argue that the potential for abuse is minimal because the 12-day waiting period does not begin to run until the *later of* the date the application is submitted or the date the borrower receives the required disclosure statement.

In 2007, after briefs were filed and oral argument was heard in this appeal, certain home equity provisions of the Texas Constitution were amended, including section 50(a)(6)(M)(i). Section 50(a)(6)(M)(i) was amended to change the phrase, "submits an application to the lender," to "submits the loan application to the lender." *See* Tex. Const. art. XVI, § 50(a)(6)(M)(i). While the Commissions amended certain regulations pursuant to the 2007 constitutional amendments, Rule 153.12(2) remained unchanged. In passing the joint resolution proposing the 2007 constitutional amendment, however, the legislature recorded a "Statement of Legislative Intent" in the House Journal, in which the author of the resolution states, "The homeowner may submit a written, electronic, *or oral* application." H.J. of Tex., 80th Leg., R.S. 2432 (2007) (emphasis added); *see also* Tex. H.R.J. Res. 72, 80th Leg., R.S., 2007 Tex. Gen. Laws 6138.[11]

In matters of constitutional construction, we may "consider such things as the legislative history and purpose of the constitutional provision." *Dewhurst v. Hendee*, 253 S.W.3d 320, 336 (Tex. App.—Austin 2008, pet. dism'd) (citing *Stringer*, 23 S.W.3d at 355; *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997)). The statement of legislative intent quoted above is contrary to ACORN's position that allowing oral applications is inconsistent with the legislature's intent to create a formal home equity lending process.

---

[11] The quoted legislator, Representative Solomons, was also an author of the 1997 home equity lending amendments.

Furthermore, the language of the 2007 amendments reflects an expression of legislative intent to allow oral applications.[12]  In support of its argument that only written loan applications may trigger the waiting period, ACORN pointed to the notice language found in section 50(g), specifically the following statement: "THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A WRITTEN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER." Tex. Const. art. XVI, § 50(g) (amended 2007).  We agree with ACORN's argument that the 50(g) notice language, while not binding, is a helpful indicator of legislative intent. *See Stringer*, 23 S.W.3d at 357 ("[S]ection 50(g)'s notice provisions do not independently establish rights or obligations for the extension of credit.").  The language of section 50(g) upon which ACORN relies, however, was amended in 2007 to omit any reference to a written application.  The relevant language now states, "THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A LOAN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER." Tex. Const. art. XVI, § 50(g).  We read the legislature's amendment of the phrase "written application" to "loan application" in this provision to be a significant change, particularly in light of the fact that this suit was pending on appeal at the time of the 2007 amendment. Furthermore, the phrase "loan application," which the legislature apparently considers to be

---

[12]  While it was the 1997 legislature, rather than the 2007 legislature, that originally enacted the home equity provisions, it is the current version of the constitution that controls for our purposes, as ACORN challenges the validity of the regulations based on inconsistency with the relevant constitutional provisions, and any challenge based on inconsistency with provisions that no longer exist would be moot.

something other than a "written application," was also inserted into the provision describing the trigger for the 12-day waiting period. *See id.* § 50(a)(6)(M)(i).

In light of the foregoing, we hold that the Commissions' interpretation of "application" to include oral applications is consistent with the plain language of the constitution as it is currently written. We sustain this issue and reverse the trial court's order to the extent it invalidates the "oral application" portion of Rule 153.12(2).

*Convenience Checks*

In a third issue on appeal, TBA and the Commissions argue that the trial court erred by invalidating Rule 153.84(1), which interpreted article 16, section 50(t)(3) of the constitution. At the time summary judgment was rendered in this case, section 50(t)(3) stated that a homeowner, in accessing a home equity line of credit (HELOC), may "not use a credit card, debit card, preprinted solicitation check, or similar device to obtain an advance." Tex. Const. art. XVI, § 50(t)(3) (amended 2007). At that time, Rule 153.84(1) stated, in relevant part:

> A lender may offer one or more non-prohibited devices or methods for use by the owner to request an advance. Permissible methods include contacting the lender directly for an advance, telephonic fund transfers, and electronic fund transfers. Examples of devices that are not prohibited similar devices include prearranged drafts, convenience checks, or written transfer instructions.

Former Rule 153.84(1).

In Former Rule 153.84(4), the Commissions defined "preprinted solicitation check" as a check that is provided to the borrower or owner for the purpose of originating or soliciting

advances on a HELOC, contains at least one preprinted key payment term, and is not requested by the borrower or owner.

ACORN challenged Former Rule 153.84 on the basis that "convenience checks" are similar devices to credit cards, debit cards, and preprinted solicitation checks and therefore should be prohibited as a "similar device" under section 50(t)(3) of the constitution. ACORN further argued that the rule did not provide a clearly defined distinction regarding permissible versus impermissible devices, emphasizing the difficulty in distinguishing between a "convenience check" and a "preprinted solicitation check."

In 2007, the relevant constitutional provision was amended to state that a homeowner may "not use a credit card, debit card, or similar device, or preprinted check unsolicited by the borrower, to obtain an advance." Tex. Const. art. XVI, § 50(t)(3).

In accordance with the 2007 constitutional amendment, the Commissions also amended Rule 153.84(1). As amended, the rule states, in relevant part:

> A lender may offer one or more non-prohibited devices or methods for use by the owner to request an advance. Permissible methods include contacting the lender directly for an advance, telephonic fund transfers, and electronic fund transfers. Examples of devices that are not prohibited include prearranged drafts, *preprinted checks requested by the borrower*, or written transfer instructions.

Current Rule 153.84(1) (emphasis added). The Commissions also deleted subsection (4) of Rule 153.84, defining "preprinted solicitation check," as that phrase no longer appears in the relevant constitutional provision. *See* Current Rule 153.84.

15

Pursuant to the 2007 amendment, the constitution now prohibits "preprinted check[s] unsolicited by the borrower," rather than "preprinted solicitation checks." Tex. Const. art. XVI, § 50(t)(3). Current Rule 153.84(1) is consistent with this language, as it includes "preprinted checks requested by the borrower" in the list of acceptable devices. The rule no longer expressly permits the use of "convenience checks," the primary focus of ACORN's challenge to the validity of the rule. Furthermore, the constitutional prohibition on the use of "similar device[s]" now applies only to devices similar to credit cards and debit cards, as opposed to the pre-amendment language prohibiting devices similar to preprinted solicitation checks, which opened the door to the possible exclusion of other types of checks, including, as ACORN argued, convenience checks. Given the relevant constitutional amendments and the subsequent changes to Rule 153.84, we hold that ACORN's challenge to Rule 153.84 has been rendered moot. We reverse the trial court's order to the extent it invalidated Rule 153.84.

*Documents Provided at Closing*

In their fourth issue on appeal, the Commissions and TBA argue that the trial court erred in invalidating Rule 153.22, which described the documents that must be provided to the borrower at closing. When summary judgment was rendered, article 16, section 50(a)(6)(Q)(v) of the constitution provided that at the time an extension of credit is made, the lender must "provide the owner of the homestead a copy of all documents signed by the owner related to the extension of credit." Tex. Const. art. XVI, § 50(a)(6)(Q)(v) (amended 2007). To interpret this provision, the Commissions adopted Former Rule 153.22, which stated:

16

> At closing, the lender must provide the owner with a copy of all documents that are signed at closing in connection with the equity loan. The lender is not required to give the owner copies of documents that were signed by the owner prior to closing, such as those signed during the application process. Because of their nature some documents, for example, a notification of the election of an owner or an owner's spouse not to rescind under the right of recission must be signed after the date of closing. The lender must provide the owner copies of documents signed after the date of closing within three business days.

Former Rule 153.22.

In challenging this regulation, ACORN argued that the Commissions improperly limited the documents to be provided to those actually signed at closing. According to ACORN, the plain language of the constitution requires that the homeowner be provided with documents signed before closing that are related to the extension of credit, such as the loan application, employment verification, and certain disclosure notices.

In 2007, the relevant constitutional provision was amended to state, "[A]t the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit." Tex. Const. art. XVI, § 50(a)(6)(Q)(v). The Commissions then amended Rule 153.22 to state:

> At closing, the lender must provide the owner with a copy of the final loan application and all executed documents that are signed by the owner at closing in connection with the equity loan. One copy of these documents may be provided to married owners. This requirement does not obligate the lender to give the owner copies of documents that were signed by the owner prior to or after closing.

Current Rule 153.22.

Current Rule 153.22 is clearly consistent with the plain language of the constitution as it is currently written. The 2007 constitutional amendment renders moot ACORN's argument that documents signed prior to closing must be provided to the homeowner, as the relevant provision now requires the lender to provide only copies of the loan application and any documents "signed by the owner at closing." Tex. Const. art. XVI, § 50(a)(6)(Q)(v). As a result, we sustain this issue on appeal and reverse that portion of the trial court's judgment invalidating Rule 153.22.

*Power of Attorney*

In its first issue on cross-appeal, ACORN argues that the trial court erred in refusing to invalidate Rule 153.15, interpreting section 50(a)(6)(N) of the home equity provisions of the constitution.[13] Section 50(a)(6)(N) states that a home equity loan must be "closed only at the office of the lender, an attorney at law, or a title company." Rule 153.15(2) states that a "lender may accept a properly executed power of attorney allowing the attorney-in-fact to execute closing documents on behalf of the owner," while subsection (3) of Rule 153.15 states that a "lender may receive consent required under Section 50(a)(6)(A) by mail or other delivery of the party's signature to an authorized physical location and not the homestead." Neither section 50(a)(6)(N) nor Rule 153.15 have been amended since ACORN filed suit.

---

[13] ACORN raises another issue on cross-appeal in which it argues that the Commissions exceeded their authority in enacting Rules 153.15(2) and 153.51(3). Because any discussion of this issue is subsumed in our analysis of ACORN's remaining two issues on cross-appeal—that the trial court erred in refusing to invalidate Rules 153.15 and 153.51(3)—we will not address it as a separate point of error. We note also that while this argument was raised in the trial court, it was not raised or ruled on as a separate issue distinct from ACORN's challenges to the individual regulations.

According to ACORN, Rule 153.15(2) is not an interpretation of the constitution, but an impermissible new rule that violates the drafters' intent to prohibit coercion in relation to the closing of a home equity loan. Furthermore, ACORN contends that Rule 153.15(3) contradicts the constitution because it allows consent to be given anywhere and mailed to an authorized location for closing. The Commissions and TBA counter that Rule 153.15(2) is not a new rule, but merely a permissible interpretation clarifying that section 50(a)(6)(N) does not change the existing principle of Texas law that allows the use of a properly executed power of attorney in business transactions. The Commissions and TBA further point out that the legislature has demonstrated its inclination to use express language prohibiting use of a power of attorney when necessary in the home equity provisions of the constitution, citing section 50(a)(6)(Q)(iv), which states that home equity lending is permitted only on the condition that "the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding." Tex. Const. art. XVI, § 50(a)(6)(Q)(iv).

We agree with the Commissions and TBA. The use of powers of attorney to designate an attorney-in-fact to act on the designor's behalf is a recognized principle of Texas law. *See, e.g.*, *Citigroup Global Mkts., Inc. v. Brown*, 261 S.W.3d 394, 402 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding); *FDIC v. Great Am. Ins. Co.*, 469 S.W.2d 254, 258 (Tex. Civ. App.—Austin 1971, writ ref'd n.r.e.). As a result, it is neither inconsistent with the constitution nor impermissible rulemaking for the Commissions to clarify that this principle continues to apply in the context of home equity loan closings, particularly where the drafters expressly prohibited the use of powers of attorney in other home equity lending contexts, but not with regard to closing the loan.

19

Furthermore, Rule 153.15(3) is not inconsistent with the literal text of the relevant constitutional provision. The Commissions' interpretation simply allows borrowers who are otherwise unable to appear in person at the closing to execute closing documents by mail, while still preserving the constitution's requirement that closing take place at the offices of the lender, an attorney, or a title company. This interpretation is not unreasonable or contrary to the plain language of the constitution.

We overrule this issue on cross-appeal and affirm that portion of the trial court's judgment upholding Rule 153.15.

*Disclosure Mailing*

In its second issue on cross-appeal, ACORN argues that the trial court erred in refusing to invalidate Rule 153.51, subparts (1) and (3), interpreting section 50(g) of the home equity provisions. Section 50(g) states that a home equity extension of credit may not be "closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument." Tex. Const. art. XVI, § 50(g). The provision then sets forth the required disclosure language. *See id.* In Rule 153.51, the Commissions interpreted the disclosure requirement, stating, in relevant part:

> (1) If a lender mails the consumer disclosure to the owner, the lender shall allow a reasonable period of time for delivery. A period of three calendar days, not including Sundays and federal legal public holidays, constitutes a rebuttable presumption for sufficient mailing and delivery.
>
> . . . .
>
> (3) A lender may rely on an established system of verifiable procedures to evidence compliance with this section.

Rule 153.51(1), (3).

ACORN contends that the Commissions' interpretation contradicts the constitutional requirement to "provide[]" notice by presuming that the borrower has received notice three days after mailing. ACORN further argues that subpart (3) creates a new, unauthorized rule by allowing lenders to rely on "an established system of verifiable procedures" rather than proving that the notice was actually provided to an individual borrower.

We agree with the trial court's determination that Rule 153.51 is consistent with the applicable constitutional provision. The constitution requires the lender to "provide[]" notice, but does not define "provide" or clarify how a lender may establish that notice was provided when the required disclosure is mailed to the borrower. The Commissions interpreted the constitution by determining that in the event of mailing, the 12-day waiting period begins to run three days after the disclosure was mailed, absent any dispute by the borrower on the issue of whether notice was provided. The borrower is free to rebut this presumption of receipt. We note also that the Commissions' interpretation incorporates familiar concepts from Texas Rule of Civil Procedure 21a, which states:

> Whenever a party has the right or is required to do some act within a proscribed period after the service of a notice or other paper upon him and the notice or paper is served upon by mail or by telephonic document transfer, three days shall be added to the prescribed period. . . . Nothing herein shall preclude any party from offering proof that the notice or instrument was not received, or, if service was by mail, that it was not received within three days from the date of deposit in a post office . . . .

Tex. R. Civ. P. 21a.

21

The constitution requires that a 12-day waiting period begin to run from the date of a certain event. The Commissions' regulations merely interpret the appropriate way to determine whether that event has occurred and to establish compliance with the notice requirement. It is for precisely that type of guidance that the Commissions were authorized to issue interpretations in the first place.[14] As a result, we cannot conclude that Rule 153.51(1) is inconsistent with the constitution. Furthermore, subpart (3) of Rule 153.51 does not represent a new rule, as ACORN contends, but merely a necessary interpretation of the means by which a lender may establish compliance with the constitutional requirement of notice. The borrower is free to offer evidence that he did not, in fact, receive proper notice. We affirm the portion of the trial court's judgment denying ACORN's challenge to Rule 153.51(1) and (3).

**CONCLUSION**

---

[14] The bill analysis for the resolution delegating interpretive authority to the Commissions stated:

> Home equity lenders in Texas often are uncertain about whether a particular action would violate the Constitution and require them to forfeit the principal on a loan. However, since home equity lending in Texas is authorized by the Constitution rather than by statute, no state agency is authorized to give guidance on the Constitution's meaning. That uncertainty translates into higher interest rates for all home equity loans as lenders try to cover the market risk they face. SJR 42 would solve the problem by giving the Finance and Credit Union Commissions the responsibility of clarifying home equity law. This would enable lenders to make loans with confidence that their actions were within the law, thus lowering their risk and, consequently, lowering the interest rates charged to customers.

House Comm. on Fin. Insts., Bill Analysis, Tex. S.J. Res. 42, 78th Leg., R.S. (2003).

We reverse that portion of the trial court's judgment invalidating Rules 153.12(2), 153.84(1), and 153.22, and render judgment denying ACORN's challenges to these rules. We affirm the remainder of the trial court's judgment.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson[15]
   Concurring and Dissenting Opinion by Justice Puryear

Affirmed in part; Reversed and Rendered in part

Filed:  January 8, 2010

---

[15]    Because Chief Justice Law was originally assigned to author this opinion, authoring duties were reassigned as of August 4, 2009. Justice Patterson was subsequently designated to replace Chief Justice Law on the panel. *See* Tex. R. App. P. 41.1.