# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2010

No. 09-50619

Lyle W. Cayce
Clerk

MANUEL B. CERDA; PETRA G. CERDA,

Plaintiffs - Appellants

v.

2004-EQR1 L.L.C.; BARCLAYS CAPITAL REAL ESTATE INC., doing
business as HomEq Servicing,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and KING and HAYNES, Circuit Judges.

KING, Circuit Judge:

Manuel and Petra Cerda appeal from the district court's judgment
rejecting their claims that aspects of their home equity loan violated the Texas
Constitution.  We agree with the district court that the Cerdas have failed to
show a violation of the Texas Constitution, and we affirm.

## I. BACKGROUND

In 1993, Manuel and Petra Cerda purchased an unimproved five-acre lot
in San Antonio, Texas, on which they subsequently built a house.  Using the
house as collateral, they obtained a home equity loan from Associates Home
Equity Services, Inc., in 1999, borrowing a principal sum of $238,659.33 to be

No. 09-50619

repaid over 30 years.  The next year, in 2000, the Cerdas refinanced that loan with Ameriquest Mortgage Company, this time with a principal sum of $325,000. The terms of the Ameriquest Mortgage loan provided for interest at a fixed rate of 10.9% for the first two years, followed by a variable rate—not less than 10.9% or greater than 16.9%—that was equal to the London Interbank Offered Rate (LIBOR) plus 6.5%.

In April 2002, in order to obtain a lower interest rate and to pay property taxes, the Cerdas again sought to refinance their home equity loan.  They contacted Clarity Mortgage Services, a mortgage broker, and applied by telephone.  Clarity Mortgage prepared a Good Faith Estimate,[1] bearing a preparation date of April 30, 2002, that showed a loan with a principal amount of $344,000, a fixed interest rate of 8.5%, estimated closing costs of $8,600, and cash to the Cerdas at closing in the amount of $10,400.[2]  On May 15, 2002, the Cerdas signed the following documents: (1) the Good Faith Estimate; (2) a Federal Truth-In-Lending Disclosure Statement;[3] and (3) a Notice Concerning Extensions of Credit Defined by Section 50(a)(6), Article XVI, Texas Constitution.[4]

---

[1] A "good faith estimate" is "an estimate of settlement charges a borrower is likely to incur, as a dollar amount, and related loan information, based upon common practice and experience in the locality of the mortgaged property."  24 C.F.R. § 3500.2; *see generally* 12 U.S.C. §§ 2601 *et seq.* (the Real Estate Settlement Procedures Act).

[2] To fully amortize a 30-year loan with a principal amount of $344,000 and a fixed interest rate of 8.5%, a borrower would need to make annual payments in excess of $31,000. At the time the Cerdas sought refinancing through Clarity Mortgage, Mr. Cerda was 72 years old and had retired from his job as a postal worker.  At trial, counsel for the Cerdas indicated that Mr. Cerda's pension at the time of refinancing was $25,000 per year.  Mr. Cerda testified that he sought the cash at closing to allow him to make payments on the loan for the first several months while he either sold the house or refinanced the loan.

[3] This document is prescribed by the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, and its implementing regulations, 12 C.F.R. §§ 226.1 *et seq.*

[4] The contents of the Notice Concerning Extensions of Credit are prescribed by article XVI, section 50(g) of the Texas Constitution.

2

No. 09-50619

The closing for this refinancing took place over one month later, on June 17, 2002. There, the Cerdas signed their only written loan application—the Uniform Residential Loan Application (URLA).[5] They also executed a promissory note and deed of trust in favor of New Century Mortgage Corporation on the same terms specified in the URLA. These terms included a principal sum of $367,500, and—like the Ameriquest Mortgage loan—provided for a variable interest rate: 8.99% for the first two years, followed by a variable rate—adjusted semiannually—equal to the six-month LIBOR plus 7.1%. The difference between interest rates from one six-month period to the next could not exceed 1.5%, and the interest rate could not fall below 8.99% or exceed 15.99%. The closing documents reflected that they were—in addition to satisfying the Ameriquest Mortgage loan, the Cerdas' property taxes, and amounts due the title and escrow company—effectuating the following transfers: (1) Clarity Mortgage received a 2.9% loan origination fee of $10,694, a credit report fee of $6, and a yield spread premium of $3,675; (2) "Appraiser" received a $325 appraisal fee; and (3) New Century Mortgage received a 3% loan discount in the amount of $11,025 and prepayment of $905.20 interest, and it issued a lender credit of $4,827.80. After all was said and done, out of the $367,500 loan, $10,923.89 was paid to satisfy outstanding property taxes, $767.97 was paid to the Cerdas as cash at closing, and over $21,000 was paid to cover fees and advance interest charges.

As a result of assignment, 2004-EQR1 L.L.C. became the holder of the Cerdas' note and deed of trust. Barclays Capital Real Estate Inc. (HomEq) services the loan. The Cerdas have not made any payments on the note since they executed it in 2002. As a result, 2004-EQR1 made several attempts to

---

[5] The URLA is a standardized loan application form developed by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac).

foreclose on the Cerdas' house, leading to litigation in Texas state courts and the issuance of several temporary restraining orders (TROs). This action represents the latest in that series of filings. On July 3, 2007, the Cerdas filed an amended petition in state court against 2004-EQR1 and HomEq, seeking a judgment of forfeiture, attorney's fees, damages, a TRO, and a permanent injunction. 2004-EQR1 and HomEq filed a joint answer, then removed the action to federal district court. The district court denied the Cerdas' motion to abstain and remand. 2004-EQR1 and HomEq later filed an amended answer, asserting various affirmative defenses and counterclaims.

After discovery, the parties submitted motions for partial summary judgment. The Cerdas' motion argued that the loan was invalid because: (1) it called for monthly payments that were not "substantially equal," in violation of article XVI, section 50(a)(6)(L) of the Texas Constitution; (2) it was issued in violation of the waiting periods prescribed by article XVI, section 50(a)(6)(M)(i) and (ii); and (3) it required the payment of fees in excess of the 3% cap imposed by article XVI, section 50(a)(6)(E). The Cerdas further argued that 2004-EQR1 and HomEq had failed to cure these violations within 60 days, thus requiring them to forfeit all principal and interest pursuant to article XVI, section 50(a)(6)(Q)(x). They also sought summary judgment on 2004-EQR1 and HomEq's affirmative defenses and counterclaims. 2004-EQR1 and HomEq sought summary judgment on the damages claims and on the claim that the loan called for payments that were not substantially equal.

On November 17, 2008, the district court considered the parties' competing motions for partial summary judgment. It agreed with 2004-EQR1 and HomEq that the loan did not call for payments that were not substantially equal and granted summary judgment on that issue. It denied the Cerdas' requests for summary judgment on whether the loan satisfied the waiting periods prescribed by article XVI, section 50(a)(6)(M)(i) and (ii), and on whether the loan violated

the 3% cap on fees imposed by article XVI, section 50(a)(6)(E). The court further granted summary judgment in favor of the Cerdas on 2004-EQR1 and HomEq's counterclaims, denied summary judgment on several affirmative defenses, and deferred ruling on defenses premised on limitations until trial.

The case then proceeded to a bench trial. At trial, the parties stipulated to several facts, including that New Century Mortgage paid Clarity Mortgage a "yield spread premium," which they defined as follows: "A yield premium or yield spread premium or yield rebate is a payment to the broker for selling a loan at an interest rate higher than market rates." On June 10, 2009, the district court issued a careful, thoughtful opinion containing findings of fact and conclusions of law. The court found that the same loan was at issue in both the Good Faith Estimate and the closing documents, despite the ultimate discrepancy in principal amount due. The court thus concluded that the waiting periods prescribed by article XVI, section 50(a)(6)(M), began to run when the Cerdas submitted their application to Clarity Mortgage by telephone sometime prior to signing the Good Faith Estimate on May 15, 2002, and were thus met by the closing date of June 17, 2002. The court further found that the 3% cap on fees[6] imposed by article XVI, section 50(a)(6)(E), had not been violated. The court found it undisputed that the Cerdas paid 3% in fees—the $10,694 broker origination fee, the $6 credit report fee, and the $325 appraisal fee. It found that other title charges and recording fees were offset by the $4,827.80 lender credit. In response to the Cerdas' arguments, the district court also found that the additional challenged payments did not count against the 3% cap: (1) the payment of $11,025 in discount points was prepayment of interest, not fees; and (2) the payment by New Century Mortgage of a $3,675 yield spread premium to Clarity Mortgage was not a payment by "the owner or the owner's spouse," as

---

[6] The 3% cap on fees was $11,025 for the principal amount of $367,500.

required to count for purposes of article XVI, section 50(a)(6)(E). The court also concluded that the loan did not violate article XVI, section 50(a)(6)(H), by securing property other than the homestead, and that the Cerdas' claims for damages failed due to the loan's compliance with the Texas Constitution. On June 24, 2009, the district court ordered that 2004-EQR1 and HomEq were entitled to foreclose, and it entered final judgment dismissing the Cerdas' claims.

The Cerdas timely appealed.

## II. DISCUSSION

On appeal, the Cerdas press three arguments. First, they claim that the district court incorrectly determined that the waiting period began to run when they submitted a telephonic application. Second, they argue that the variable interest rate caused the loan payments not to be substantially equal. Finally, they argue that the discount points are properly characterized as fees that count against the 3% cap.[7] In addition, the Cerdas request that we certify these issues to the Texas Supreme Court. We decline their request for certification and instead address each of their arguments in turn.[8]

---

[7] Originally, the Cerdas pressed a fourth argument, challenging the district court's denial of their motion to remand the action to state court on the basis of untimely removal. However, approximately three weeks before oral argument, they voluntarily withdrew that issue from their appeal. Accordingly, we do not address whether the district court erred in denying the motion to remand. In addition, the Cerdas do not challenge the district court's conclusion that the loan did not violate article XVI, section 50(a)(6)(H), by securing property other than the homestead, and 2004-EQR1 and HomEq have not cross-appealed the dismissal of their counterclaim for fraud.

[8] The dissent would certify the Cerdas' second argument, relating to variable interest rates and substantial equality of payments. As the dissent recognizes, the decision whether to certify a question lies within our discretion. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 487 (5th Cir. 2003) (citing *Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.*, 283 F.3d 650, 656 (5th Cir. 2002)). In our view and as set out in detail *infra*, Texas law is sufficiently clear to counsel against certification. *See Patterson*, 335 F.3d at 487 (denying certification where, "[a]lthough the state law questions . . . [we]re important and complex, . . . Texas law [wa]s sufficiently clear").

## A.    Legal Standards

We apply Texas substantive law and federal procedural law in this diversity action.  *See Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008).  We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party.  *Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 225 (5th Cir. 2010).  Following a bench trial, we review the district court's conclusions of law de novo and its factual findings for clear error.  *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010).

The legal questions in this case require interpretation of the Texas Constitution.  The Texas Supreme Court has set out the following approach to constitutional construction:

> When interpreting our state constitution, we rely heavily on its literal text and must give effect to its plain language.  We strive to give constitutional provisions the effect their makers and adopters intended.  We construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments and provisions in light of each other. And we strive to avoid a construction that renders any provision meaningless or inoperative.

*Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 344 (Tex. 2001) (citations omitted).  "In construing a constitutional amendment, we may also consider its legislative history."  *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 355 (Tex. 2000) (citing TEX. GOV'T CODE § 311.023(3); *Harris v. City of Fort Worth*, 180 S.W.2d 131, 133 (Tex. 1944)).

## B.    Background of Texas Home Equity Loans

Home equity loans are of relatively recent vintage in Texas.  The Texas Supreme Court has explained:

> For over 175 years, Texas has carefully protected the family homestead from foreclosure by limiting the types of liens that can be placed upon homestead property. Texas became the last state in the nation to permit home-equity loans when constitutional

No. 09-50619

amendments voted on by referendum took effect in 1997. Such loans permit homeowners to use the equity in their home as collateral to refinance the terms of prior debt and secure additional loans at rates more favorable than those for consumer loans. Although home-equity lending is now constitutionally permissible, article XIV, section 50(a)(6) of the Texas Constitution still places a number of limitations on such lending.

*LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) (per curiam). Among the limitations placed on such lending is the requirement that lenders forfeit all principal and interest if they fail to cure violations of their obligations. *See* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). In addition, before issuing home equity loans, lenders must provide borrowers with a notice, the content of which is specified in article XVI, section 50(g).

Originally, no Texas administrative agency was empowered with rule-making authority over the amendments. However, shortly after the amendment was enacted, four Texas agencies charged with regulating entities that made home equity loans issued an advisory publication entitled the REGULATORY COMMENTARY ON EQUITY LENDING PROCEDURES (the "REGULATORY COMMENTARY"). *See Stringer*, 23 S.W.3d at 357. The Texas Supreme Court has indicated that the REGULATORY COMMENTARY is persuasive authority:

> Although the commentary is advisory and not authoritative, it represents four Texas administrative agencies' interpretation of the Home Equity Constitutional Amendment. These agencies are responsible for regulating the entities that make home equity loans. The Commentary's purpose is to provide guidance to lenders and consumers about the regulatory views on the meaning and effect of article XVI, section 50.

*Id.* Subsequently, authority to issue binding rules was granted:

> The Texas Constitution was amended again in 2003 to authorize the legislature to delegate the authority to issue interpretations of the home equity lending provisions . . . . Pursuant to this amendment, the legislature delegated interpretive authority over the home equity provisions to the [c]ommissions, and the

8

[c]ommissions in turn adopted a number of regulations interpreting the home equity provisions. The [c]ommissions' interpretations are subject to review under the [Texas] Administrative Procedure Act (APA).

*Tex. Bankers Ass'n v. Ass'n of Cmty. Orgs. for Reform Now (ACORN)*, 303 S.W.3d 404, 407–08 (Tex. App.—Austin 2010, pet. filed) (citations and footnote omitted) (citing TEX. CONST. art. XVI, § 50(u)). However, the home equity loan amendments do not apply retroactively, *see Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 155–57 (Tex. App.—Fort Worth 2007, pet. denied), and a rule promulgated under authority of those constitutional provisions provides safe harbor to lenders only if the rule is in effect when the loan is made, *see* TEX. CONST. art. XVI, § 50(u)(1). Thus, we apply the version of the Texas Constitution that was in effect in 2002—when the Cerdas entered into the loan with New Century Mortgage—and treat administrative interpretations as persuasive authority.

## C.    Waiting Period

The Cerdas first argue that their loan did not comply with the mandatory waiting periods prescribed by article XVI, section 50(a)(6)(M) and (g)(M). In 2002, § 50(a)(6)(M) provided:

> The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for: . . . an extension of credit that: . . . is closed not before: the 12th day after the later of the date that the owner of the homestead *submits an application* to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section . . . .

TEX. CONST. art. XVI, § 50(a)(6)(M)(i) (2002) (emphasis added). At that time, § 50(g)(M) provided:

> An extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate

instrument: . . . the loan may not close before 12 days after you *submit a written application* to the lender or before 12 days after you receive this notice, whichever is later . . . .

TEX. CONST. art. XVI, § 50(g)(M) (2002) (emphasis added).[9]  The italicized language reveals a discrepancy between subsections (a)(6)(M) and (g)(M): the former contemplates "an application" while the latter contemplates "a written application."[10]

Whether the waiting period is triggered by any application or only a written application will determine whether the 12-day waiting period was met in this case.  The Cerdas submitted a telephonic application prior to May 15, 2002.  On May 15, 2002, they signed both the Good Faith Estimate and a Notice Concerning Extensions of Credit Defined by Section 50(a)(6), Article XVI, Texas Constitution—a notice specifying the requirement of "a written application." They submitted the URLA—their first and only written application—at the closing on June 17, 2002.  On appeal, the Cerdas do not contest that their submission of a telephonic application and receipt of the notice prescribed by § 50(g) each occurred at least 12 days prior to closing.  Instead, they argue that the 12-day waiting period before closing could occur did not begin to run until June 17, 2002, when they submitted a written application—the URLA—at the closing itself.  They claim, therefore, that the requirement of a 12-day waiting period was simply not met.

In *Stringer*, the Texas Supreme Court was faced with a conflict between provisions in § 50(a)(6) and (g), which it described as follows:

---

[9] In the Texas Constitution, the notice required by § 50(g) is written entirely in capital letters.  To more easily compare the terms of §§ 50(a)(6) and (g), we have normalized the typeface in the notice language.

[10] The discrepancy has since been eliminated, as both provisions have been amended so that the version presently in force refers simply to the submission of "a loan application." TEX. CONST. art. XVI, § 50(a)(6)(M) & (g)(M).

No. 09-50619

Section 50(a)(6) allows a home-equity lender to require the borrower to use loan proceeds to pay: (1) debts secured by the homestead; and (2) non-homestead debts to third-party creditors. On the other hand, section 50(g) provides that a home-equity lender cannot require a borrower to apply loan proceeds to another debt that is not secured by the home or to another debt to the same lender.

We agree . . . that the plain language of section 50(a)(6)(Q)(i) and section 50(g)(Q)(1) conflict. And, there is nothing in the amendment, its legislative history, or the parties' arguments that hints at a legislative reason for the conflict other than speculation that the difference in the language arises from an oversight.

23 S.W.3d at 356 (citations omitted). The court agreed with the view of the REGULATORY COMMENTARY that "section 50(a)(6)(Q)(i) provides the substantive rights and obligations of lenders and borrowers while section 50(g)(Q)(1) provides only the language for the mandatory notice to borrowers." *Id.* It then expressly held that "section 50(a)(6) and the loan documents themselves provide the substantive rights and obligations of the lenders and borrowers" and "section 50(g)'s notice provisions do not independently establish rights or obligations for the extension of credit." *Id.* at 357. Accordingly, under *Stringer*, we must look to § 50(a)(6)(M)(i) for the Cerdas' substantive rights relating to the 12-day waiting period. Under that provision, the waiting period was triggered and began to run when the Cerdas "submit[ted] an application." TEX. CONST. art. XVI, § 50(a)(6)(M)(i) (2002). The question remains, however, whether submission of the telephonic application constituted the submission of an application within the meaning of § 50(a)(6)(M)(i).

The Cerdas assert that the term "written application" in § 50(g)(M)(1) does not contradict the term "application" in § 50(a)(6)(M)(i) but instead informs its meaning. We disagree. The Texas Supreme Court has explained that, in interpreting the meaning of a constitutional provision, we must "rely heavily on its literal text and . . . give effect to its plain language." *Stringer*, 23 S.W.3d at

11

No. 09-50619

355 (citing cases). Under this approach, it is clear that the term "written application" refers to a subset of "application[s]." Because the broad term "application" is not restricted by the word "written" in § 50(a)(6)(M)(i), we interpret it to encompass oral applications, including telephonic applications such as the one submitted by the Cerdas. This is the approach adopted by the REGULATORY COMMENTARY. *See* REGULATORY COMMENTARY 7 ("An application for a loan may be given orally or electronically and does not have to be in writing.").

Our interpretation is consistent with the version of § 50(a)(6)(M)(i) currently in force, which was amended in 2007 to refer generally to a "loan application." TEX. CONST. art. XVI, § 50(a)(6)(M)(i); *see also* 7 TEX. ADMIN. CODE § 153.12(2) ("A loan application may be given orally or electronically."). The legislative history behind that amendment reveals the broad reach of that term:

> Section 50(a)(6)(M)(i) was amended to change the phrase, "submits an application to the lender," to "submits the loan application to the lender." . . . In passing the joint resolution proposing the 2007 constitutional amendment, however, the legislature recorded a "Statement of Legislative Intent" in the House Journal, in which the author of the resolution states, "The homeowner may submit a written, electronic, *or oral* application." H.J. of Tex., 80th Leg., R.S. 2432 (2007) (emphasis added); *see also* Tex. H.R.J. Res. 72, 80th Leg., R.S., 2007 Tex. Gen. Laws 6138.

*ACORN*, 303 S.W.3d at 413. The *ACORN* court concluded that the administrative "interpretation of 'application' to include oral applications is consistent with the plain language of the constitution as it is currently written." *Id.* at 414. We agree that the plain meaning of the term "loan application" includes oral applications. Similarly, we see nothing in the term "application" that would operate to exclude oral applications.

The Cerdas argue in the alternative that the telephonic application did not trigger the 12-day waiting period because it was an application for a $344,000

12

loan that was never made and not for the $367,500 loan on which they ultimately closed. Following the bench trial, the district court expressly rejected that contention, stating that "[w]hile there is evidence to suggest that [the Cerdas] and Clarity [Mortgage] originally discussed a loan with a principal of $344,000 and $10,600 cash back to the Cerdas, . . . the Court concludes that this was part of the same loan transaction as the final loan for $367,500, and thus was sufficient to begin the 12-day period." In reaching this finding of fact, the court reasoned that a loan of $344,000 would have been unable to satisfy both the Ameriquest Mortgage loan amount and the property taxes that were owed, so the parties negotiated an increase in the principal amount of the loan. Thus, even though the terms of the New Century Mortgage note ultimately differed from those shown in the Good Faith Estimate, the same loan was contemplated by both documents. We agree with 2004-EQR1 and HomEq that this "account of the evidence is plausible in light of the record viewed in its entirety," *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985), and, accordingly, is not clearly erroneous.

## D.    Substantial Equality

The Cerdas next argue that the variable interest rate of the loan violated the constitutional requirement that scheduled payments be "substantially equal" in amount. This claim involves two distinct constitutional provisions, one requiring substantial equality between payments and another authorizing variable rates of interest. Section 50(a)(6)(L) imposes the requirement of substantial equality, stating that a home equity loan must be "scheduled to be repaid in substantially equal successive monthly installments beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled

installment." TEX. CONST. art. XVI, § 50(a)(6)(L) (2002).[11]  Section 50(a)(6)(O), in contrast, authorizes variable rates of interest by providing that a home equity loan may "permit[] a lender to contract for and receive any fixed or variable rate of interest authorized under statute."  TEX. CONST. art. XVI, § 50(a)(6)(O) (2002).[12]

As the parties recognize, these two provisions exist in some tension with each other.  The parties therefore offer divergent constructions that seek to "avoid . . . render[ing] [either] provision meaningless or inoperative." *Stringer*, 23 S.W.3d at 355 (citing *Hanson v. Jordan*, 198 S.W.2d 262, 263 (Tex. 1946)). The Cerdas press a construction that would convert a variable rate of interest into a variable term: an increase in the interest rate must be accompanied by an extension of the term of the loan, and vice versa, for scheduled installments to remain "substantially equal." 2004-EQR1 and HomEq dispute that construction, urging instead that the requirement of substantial equality exists to ensure that home equity loans are fully amortized[13] and that balloon payments[14] are prohibited.  The district court accepted the interpretation offered by 2004-EQR1 and HomEq, and we do as well.

---

[11] The version of § 50(a)(6)(L) currently in force changes only the requirement that the installments be "monthly."  *See* TEX. CONST. art. XVI, § 50(a)(6)(L)(i) (stating that scheduled repayments must be "in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly . . .").

[12] Section 50(a)(6)(O) has not been amended since the time the Cerdas entered into the loan.

[13] When a loan is fully amortized, the installments suffice to extinguish the principal amount and all accrued interest over the life of the loan.

[14] A "balloon note" is "[a] note requiring small periodic payments but a very large final payment."  BLACK'S LAW DICTIONARY 1162 (9th ed. 2009).  If, for example, a loan is amortized over a 30-year period but has only a 15-year term, a substantial amount of principal will remain at the end of the 15th year.  In such a case, the lender will require that the principal be paid off in a lump sum with the final payment.  The final payment, called a "balloon payment," is "much larger than the preceding regular payments and . . . discharges the principal balance of the loan." *Id.* at 1243.

No. 09-50619

The opinion of the REGULATORY COMMENTARY supports the requirement of full amortization and the prohibition on balloon payments:

> The authorization of a variable interest rate is ambiguous when read in connection with the provision relating to substantially equal successive monthly installments. . . . [A]n equity loan providing in accordance with applicable law for an interest rate that varies from time to time may provide for a payment amount that varies from time to time, assuming that the loan is regularly amortizing and that the rate adjusts on a regular basis, such as annually. . . . The amount of the payment should not change more frequently than the interest rate adjustment. The scheduled payment amount between each payment change date should be substantially equal and the amount of the payment should equal or exceed the amount of interest scheduled to accrue between each payment date.
>
> . . . An equity loan must be structured in a way such that the transaction regularly amortizes, contributes to amortization of principal, and does not result in a balloon payment.

REGULATORY COMMENTARY 8 (discussing TEX. CONST. art. XVI, § 50(a)(6)(O)); *see also id.* at 7 ("[T]o have substantially equal installments would require that some amount of principal must be reduced with each installment. This effectively precludes the permissibility of balloon payments." (discussing TEX. CONST. art. XVI, § 50(a)(6)(L))). This construction gives effect to both § 50(a)(6)(L) and (a)(6)(O) while still offering three forms of protection to the borrower: (1) if all payments are made according to schedule, the loan will be fully extinguished; (2) at the end of the loan's term, the borrower will not have to worry about obtaining a second loan to satisfy the balloon payment; and (3) the borrower will not be confronted with large month-to-month variations in payment amount. In contrast, the Cerdas' interpretation would effectively provide for a loan with a variable *term*, not a variable rate, and § 50(a)(6)(O) speaks of variable *rates*. Such an approach would also require payments to be *exactly* equal rather than substantially equal—a requirement not found in the text of § 50(a)(6).

15

No. 09-50619

In addition, the legislative history of § 50(a)(6)—or more precisely, the lack thereof—supports adopting the REGULATORY COMMENTARY's view. In 2004, rules were issued under the authority of § 50(u). The rule interpreting § 50(a)(6)(O) provides that "[t]he lender may contract to vary the scheduled installment amount when the interest rate adjusts on a variable rate equity loan." 7 TEX. ADMIN. CODE § 153.16(3).[15] Similarly, the rule interpreting § 50(a)(6)(L) provides

---

[15] The full text of § 153.16 provides:

A lender may contract for and receive any fixed or variable rate of interest authorized under statute.

(1)    An equity loan that provides for interest must comply with constitutional and applicable law.    Interest rates on certain first mortgages are not limited on loans subject to the federal Depository Institutions Deregulation and Monetary Control Act of 1980 and the Alternative Mortgage Transaction Parity Act.  Chapter 342 of the Texas Finance Code provides for a maximum rate on certain secondary mortgage loans.  Chapter 124 of the Texas Finance Code and federal law provide for maximum rates on certain mortgage loans made by credit unions.  These statutes operate in conjunction with Section 50(a) and other constitutional sections.

(2)  An equity loan must amortize and contribute to amortization of principal.

(3)  The lender may contract to vary the scheduled installment amount when the interest rate adjusts on a variable rate equity loan.  A variable-rate loan is a mortgage in which the lender, by contract, can adjust the mortgage's interest rate after closing in accordance with an external index.

(4) The scheduled installment amounts of a variable rate equity loan must be:

(A) substantially equal between each interest rate adjustment; and

(B) sufficient to cover at least the amount of interest scheduled to accrue between each payment date and a portion of the principal.

(5) An equity loan agreement may contain an adjustable rate of interest that provides a maximum fixed rate of interest pursuant to a schedule of steps or tiered rates or provides a lower initial interest rate through the use of a discounted rate at the beginning of the loan.

7 TEX. ADMIN. CODE § 153.16.  This rule has not been amended since it became effective in

16

No. 09-50619

that "[f]or a closed-end equity loan to have substantially equal successive periodic installments, some amount of principal must be reduced with each installment. This requirement prohibits balloon payments." 7 TEX. ADMIN. CODE § 153.11(3).[16] While the constitutional provisions have been amended since 2004, there has been no proposal to amend § 50(a)(6)(L) and (a)(6)(O) to alter or undo the rules' interpretations of those provisions. This is especially significant in light of the fact that the advisory REGULATORY COMMENTARY endorsed the same construction for nearly six years prior to these rules taking effect. We thus agree with the district court that "the agencies' interpretation is consistent with the legislative history," and we affirm summary judgment for

2004.

[16] The full text of § 153.11 provides:

Unless an equity loan is a home equity line of credit under Section 50(t), the loan must be scheduled to be repaid in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment.

(1) The two month time period contained in Section 50(a)(6)(L)(i) begins on the date of closing.

(2) For purposes of Section 50(a)(6)(L)(i), a month is the period from a date in a month to the corresponding date in the succeeding month. For example, if a home equity loan closes on March 1, the first installment must be due no later than May 1. If the succeeding month does not have a corresponding date, the period ends on the last day of the succeeding month. For example, if a home equity loan closes on July 31, the first installment must be due no later than September 30.

(3) For a closed-end equity loan to have substantially equal successive periodic installments, some amount of principal must be reduced with each installment. This requirement prohibits balloon payments.

(4) Section 50(a)(6)(L)(i) does not preclude a lender's recovery of payments as necessary for other amounts such as taxes, adverse liens, insurance premiums, collection costs, and similar items.

7 TEX. ADMIN. CODE § 153.11. This provision was amended, effective in 2008. The original rule lacked the language currently contained in subsections (1) and (2). *See* 29 Tex. Reg. 84 (2004) (7 TEX. ADMIN. CODE § 153.11).

17

No. 09-50619

2004-EQR1 and HomEq on this claim.[17]

### E.    Fees Cap

Finally, the Cerdas claim that the loan required them to pay fees in excess of the 3% cap imposed by the Texas Constitution.  The relevant provision mandates that a home equity loan must:

> not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit.

TEX. CONST. art. XVI, § 50(a)(6)(E) (2002).[18]  To support their claim that they were charged fees in excess of 3%—which the parties agree is $11,025 for the loan—the Cerdas direct us to a settlement statement on a form HUD-1 (the "HUD-1") that they signed at the closing on June 17, 2002.

The settlement charges listed on the HUD-1 are arranged within four distinct categories.  Under "Items Payable in Connection with Loan," six items are listed: (1) a "loan origination fee" of $10,694 to Clarity Mortgage; (2) a "loan discount" of $11,025 to New Century Mortgage; (3) an "appraisal fee" of $325; (4) a "credit report" of $6 to Clarity Mortgage; (5) a "lender credit" of $4,827.80 from New Century Mortgage; and (6) a "yield spread preium [sic]" of $3,675 to Clarity Mortgage.  Under "Items Required by Lender to Be Paid in Advance," an item of $905.20 is listed for "interest from 6/21/02 to 7/1/02."  Under "Title Charges,"

---

[17] The dissent suggests that, in light of the tension between §§ 50(a)(6)(L) and (a)(6)(O) and the dangers arising from "payment shock," we should certify this issue to the Texas Supreme Court for resolution rather than reject the variable-term theory pursued by the Cerdas.  Although the danger to a homeowner arising from a sudden large change in the interest rate is real, we do not believe that it would cause the Texas Supreme Court to resolve the tension in a manner contrary to that set forth by the REGULATORY COMMENTARY and the current regulations.

[18] There have been no subsequent amendments to § 50(a)(6)(E).

several items, totaling $3,242.72, are listed as paid to "Netco."[19]  Finally, under "Government Recording and Transfer Charges," a $69 item appears for "recording deed" and "mtg releases."  In total, the HUD-1 lists settlement charges of $21,114.12.[20]

The district court held—and the parties do not dispute—that three of these items count toward the 3% cap as fees that the Cerdas were required to pay: the $10,694 loan origination fee paid to Clarity Mortgage, the $6 credit report fee paid to Clarity Mortgage, and the $325 appraisal fee paid to an unknown "appraiser."  These amounts total $11,025—exactly 3% of the loan's principal amount of $367,500.  In addition, the Cerdas were required to pay title charges and recording fees totaling $3,311.72—bringing the fees to $14,336.72.  However, this amount was offset by the $4,827.80 lender credit, lowering the total to $9,508.92.  At issue are the remaining two items: the $3,675 yield spread premium and the $11,025 in discount points.  The Cerdas argue that the district court failed to properly characterize those items as fees for purposes of § 50(a)(6)(E).  Specifically, they claim that the yield spread premium must be factored into the other fees Clarity Mortgage received, resulting in a total broker fee of $14,375, or 4% of the principal amount of the loan.  They also claim that the $11,025 in discount points were not legitimate but were instead diverted to the lender credit, which was used to offset non-interest fees.  2004-EQR1 and HomEq respond that the district court correctly determined that neither the yield spread premium nor the discount points counted toward the 3% cap.

---

[19] These items are listed as: (1) "Title Insurance" in the amount of $2,619; (2) "EPA/ARM" in the amount of $70; (3) "TAX DEL" in the amount of $25; (4) "TAX CERT" in the amount of $41.82; (5) "ESCROW FEE" in the amount of $225; and (6) "T-42" in the amount of $261.90.

[20] This amount excludes both the $325 appraisal fee and the $3,675 yield spread premium.  Including the appraisal fee yields a total settlement charge of $21,439.12, while including both items yields a total settlement charge of $25,114.12.

## 1.    Yield Spread Premium

We have previously addressed whether a yield spread premium constitutes a fee that counts against the 3% cap imposed by § 50(a)(6)(E).  In *Maluski v. US Bank NA*, we addressed a borrower's claim that "a yield spread premium was paid outside of closing by the lender to the mortgage broker" and that the "fee was ultimately passed on to him."  349 F. App'x 971, 973 (5th Cir. 2009) (per curiam).  Following the Texas Supreme Court's directive that, in interpreting the Texas Constitution, "'we rely heavily on its literal text and we must give effect to its plain language,'" *id.* (alteration omitted) (quoting *Doody*, 49 S.W.3d at 344), we recognized that "[t]he literal text of the Texas [C]onstitution protects the 'owner or the owner's spouse' from paying the prohibited fees," *id.* (quoting TEX. CONST. art. XVI, § 50(a)(6)(E)).  We then reasoned that because the yield spread premium was paid to the broker by the lender and not by the owner or the owner's spouse, it was not a fee within the meaning of § 50(a)(6)(E).  *Id.*  That reasoning applied even if the lender "ultimately recoup[ed] the payment due to [the borrower] paying a higher interest rate over the life of the loan" because such an "indirect payment is not contemplated by a plain reading of the state constitution."  *Id.* (citing *Bjustrom v. Trust One Mortg. Corp.*, 322 F.3d 1201, 1205 (9th Cir. 2003) (reaching the same result under a plain reading of the Federal Housing Administration's regulations)).

We find *Maluski*'s reasoning persuasive, and we hold that the yield spread premium paid by New Century Mortgage to Clarity Mortgage was not a fee that the Cerdas were required to pay to originate the loan.[21]  Accordingly, the district court did not err in excluding the yield spread premium from the 3% cap imposed by § 50(a)(6)(E).

---

[21] The parties in this case stipulated that a "yield spread premium . . . is a payment to the broker for selling a loan at an interest rate higher than market rates" and that "New Century Mortgage Corp.[] paid . . . Clarity Mortgage Services[] a 1% yield premium of $3,675."

No. 09-50619

## 2.    Discount Points

The Cerdas also challenge the district court's finding that the $11,025 in discount points was appropriately deemed interest rather than fees.[22] Essentially, they claim that "the lender purportedly charged $11,025 for discount points, but most of the money was used to pay the non-interest fees" and, thus, "[t]he 3% charge for discount points is a transparent attempt to evade the 3% closing cost limit."

In determining whether discount points are properly characterized as interest or as fees counting against the 3% cap, we are without the benefit of guidance from the Texas Supreme Court on the matter. In this diversity case, because "no state court decisions control, we must make an '*Erie* guess' as to how the Texas Supreme Court would apply state law." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008)). "In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the higher court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GmbH*, 524 F.3d 676, 678 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002)).

There are two conflicting decisions by Texas intermediate courts regarding the proper definition of "interest" for purposes of § 50(a)(6)(E) and whether discount points fall within that definition. In *Tarver v. Sebring Capital Credit Corp.*, the court addressed the borrowers' claims that "a liberal interpretation

---

[22] Discount "[p]oints are commonly charged as an added compensation to the lender in exchange for a lower interest rate." *Tarver v. Sebring Capital Credit Corp.*, 69 S.W.3d 708, 709 (Tex. App.—Waco 2002, no pet.); *accord ACORN*, 303 S.W.3d at 412 n.10 (noting that discount points are "charged by the lender in exchange for a lower interest rate").

of section 50(a)(6)(E) should lead to the conclusion that points are 'fees'; otherwise, lenders could disguise many 'fees' as points and circumvent the three-percent rule."   69 S.W.3d at 711.   The *Tarver* court first noted that points—like interest—"are calculated as a percent of the principal."   *Id.* ("The difference is that points are calculated once on the original principal balance, whereas interest is calculated monthly on a decreasing principal balance.   In either case, there is a percent charged in relation to the principal balance."). However, the court did not rely solely on that analogy and instead looked to a variety of "statutory and administrative definitions of and references to 'interest' [that] either expressly or impliedly include[d] points."   *Id.* at 712.[23]   This included the opinion of the REGULATORY COMMENTARY, which states:

> A borrower may not be required to pay fees, in addition to any interest, in excess of three percent of the principal amount.   The language specifically excludes interest from the limitation.   The word "interest" means interest as defined in the *Texas Credit Title* and as interpreted by the courts of the state of Texas.   Additionally, *charges that constitute interest under the law, including, for example, points, are not fees* subject to the three percent limit.   Fees that are required to be paid and that are not interest are subject to the three percent limitation.   There is no restriction on a lender absorbing costs that might otherwise be fees and, therefore, covered by the fee limitation.[24]

REGULATORY COMMENTARY 3 (emphasis added) (discussing § 50(a)(6)(E)).[25]   The

---

[23] The sources cited by the *Tarver* court included provisions relating to bank loans under TEXAS FINANCE CODE ANN. § 34.203, interest rates and usury under TEXAS FINANCE CODE ANN. § 301.002(a)(4), consumer loans under what is currently 7 TEXAS ADMINISTRATIVE CODE § 83.102(20), secondary loans under what is currently 7 TEXAS ADMINISTRATIVE CODE § 83.701(b), and usury under what is currently 7 TEXAS ADMINISTRATIVE CODE § 83.707(f).   *See Tarver*, 69 S.W.3d at 712.

[24] We note that the final sentence of the above-quoted language expressly endorses the use of lender credits such as the one New Century Mortgage issued to the Cerdas.

[25] The current version of the regulations promulgated under § 50(u) provide that the word "interest" means "interest as defined in the Texas Finance Code § 301.002[a](4) and as interpreted by the courts."   7 TEX. ADMIN. CODE § 153.1(11).   Section 301.002(a)(4) of the

No. 09-50619

*Tarver* court then concluded that "the plain language of [§ 50(a)(6)(E)], as interpreted by reference to Texas statutes and administrative regulations," compelled the "conclu[sion] that points are not 'fees' . . . because they are not charged to 'originate, evaluate, maintain, record, insure, or service the extension of credit.'" 69 S.W.3d at 712 (quoting TEX. CONST. art. XVI, § 50(a)(6)(E)).

More recently, however, another Texas intermediate court has disagreed. In *ACORN*, the court found that, "[g]iven the inherent differences between the consumer-protection mechanisms of the usury statutes, which require a broad definition of interest, and the protective purposes of the home equity fee cap, use of the usury definition of interest for purposes of the fee cap fails to preserve the legislative intent" of § 50(a)(6)(E). 303 S.W.3d at 410. The *ACORN* court reasoned that "[t]he plain language of [§ 50(a)(6)(E)] creates a three-percent cap on fees other than interest in the context of a home equity loan," and the administrative "interpretation, which classifies fees charged by the lender as interest, essentially renders this cap meaningless." *Id*. at 412. Accordingly, the *ACORN* court affirmed the trial court's judgment invalidating the administrative rules to the extent that they used the broader definition of interest in the usury context. *Id.*

We are persuaded that the Texas Supreme Court, if faced with a choice between the approaches to defining "interest" in *Tarver* and in *ACORN*, would follow the *Tarver* court's approach. The *Tarver* court's approach is supported by numerous current regulations as well as the REGULATORY COMMENTARY. It also

TEXAS FINANCE CODE provides the following definition of "interest":

> "Interest" means compensation for the use, forbearance, or detention of money. The term does not include time price differential, regardless of how it is denominated. The term does not include compensation or other amounts that are determined or stated by this code or other applicable law not to constitute interest or that are permitted to be contracted for, charged, or received in addition to interest in connection with an extension of credit.

TEX. FIN. CODE ANN. § 301.002(a)(4) (West 2006).

has the advantage of providing lenders and borrowers with a consistent and straightforward definition of "interest," rather than one that varies depending on the nature of the underlying loan.[26]    While the *ACORN* court was appropriately concerned with ensuring that the 3% cap adequately protected consumers, we disagree that the *Tarver* approach "essentially renders this cap meaningless." *Id.*  A broad definition of "interest" that includes discount points does not result in an absence of consumer protection: Characterizing discount points as interest rather than fees would not give lenders carte blanche to charge exorbitant fees through the guise of discount points precisely because the discount points would then be characterized as interest—and thus subject to the consumer-protection provisions of the usury laws.  Moreover, the *ACORN* court, while finding the usury definition of "interest" incompatible with the "plain language" of § 50(a)(6)(E), failed to suggest any viable alternative definition.  *See id.* at 412 n.10 ("[W]e are not in the position to provide a substitute definition of interest or to definitively categorize 'discount points,' 'origination points,' or any other charges that might be imposed by a lender as either 'interest' or 'fees.'").  Following *Tarver*, which endorsed the approach commended by the REGULATORY COMMENTARY, we conclude that the district court correctly found that the discount points involved in the Cerdas' loan were interest that did not count against the 3% cap in § 50(a)(6)(E).

Even assuming, *arguendo*, that the Texas Supreme Court would adopt the *ACORN* court's approach and impose a narrower definition of "interest" than the regulations provide, we would still find no error in the district court's conclusion.  The *ACORN* court noted that "true 'discount points,' charged by the lender in

---

[26] It is also possible that applying both a broad and a narrow definition of "interest" in a single loan transaction might lead to the result that a particular settlement charge item would be counted against the lender both as "interest" under the usury laws and as "fees" under § 50(a)(6)(E).

exchange for a lower interest rate, should qualify as interest." *Id*. at 412 n.10. Here, the Cerdas have offered two reasons why the discount points in this case are not "true" discount points. First, they urge that it would be inconsistent for a lender to pay a broker a yield spread premium for selling a loan with an above-market interest rate while simultaneously charging discount points that reduce the interest rate. Second, they suggest that the lender credit—which was used to offset non-interest fees—was paid directly out of the funds set aside as discount points; accordingly, they argue, we should treat the discount points not as interest but instead as non-interest fees. However, neither of these contentions can overcome the district court's factual finding—which we review for clear error—that the Cerdas "have not shown by a preponderance of the evidence, or in fact by any evidence, that the 3% paid by the Cerdas in loan discount fees was not a legitimate discount point fee."

Regarding the presence of the yield spread premium, it is not implausible that a yield spread premium and the payment of discount points could coexist within the same loan transaction. A yield spread premium, as stipulated by the parties, is "a payment to the broker for selling a loan at an interest rate higher than market rates." Nothing in this definition precludes the borrower from negotiating with the lender to reduce that interest rate by paying up-front discount points. There is nothing inherently illogical about a lender rewarding a broker for selling a loan with a higher interest rate but being willing to accept some of that interest in advance. At the very least, we see no clear error in the district court's finding that the Cerdas' arguments, "based on an apparent inconsistency between payment of discount points by the borrower and the payment of a yield premium/rebate by the lender and an allegedly excessive fee to the broker," were "speculative."

With respect to the lender credit of $4,827.80, we note that the REGULATORY COMMENTARY expressly provides that "[t]here is no restriction on

25

No. 09-50619

a lender absorbing costs that might otherwise be fees and, therefore, covered by the fee limitation." REGULATORY COMMENTARY 3 (discussing § 50(a)(6)(E)). Additionally, we addressed this situation in *Maluski*, where we affirmed the grant of summary judgment to the lender despite the borrower's argument that the lender was merely shifting numbers from one column to another to avoid the 3% cap:

> The HUD-1 statement shows $5,557.95 in fees that were subject to the three percent cap. It also shows, however, that Maluski was given a closing cost credit of $2,070.45, meaning that the total fees were actually $3,487.50, exactly three percent of the principal amount. Maluski argues that U.S. Bank admitted that it lacked evidence of how the credit was applied, and he speculates that a portion of the credit could have been applied to interest points charged at closing, which were not subject to the three percent cap. We are unpersuaded. The settlement statement clearly shows that Maluski was not actually charged fees of more than three percent of the principal loan. His unsubstantiated argument of how the credit theoretically could have been manipulated is insufficient to defeat summary judgment.

349 F. App'x at 972–73. We accord the district court greater deference here because it sat as the trier of fact in a bench trial, *see Arete Partners*, 594 F.3d at 394, and we discern no clear error in the district court's finding that the discount points were the legitimate prepayment of interest.

### III. CONCLUSION

The Cerdas have failed to demonstrate that their home equity loan violated the provisions of article XVI, section 50(a)(6) of the Texas Constitution, and the loan is thus not subject to forfeiture under article XVI, section 50(a)(6)(Q)(x). Accordingly, the judgment of the district court is AFFIRMED.

HAYNES, Circuit Judge, concurring and dissenting:

I concur in the majority's opinion with the exception of section II.D. As to this subject – the meaning of "substantially equal" – I respectfully dissent from the decision not to certify this question to the Texas Supreme Court. Under Texas law, "[t]he Supreme Court of Texas may answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." TEX. R. APP. P. 58.1; *see also* TEX. CONST. art. V, § 3-c(a). Our court should certify the question of whether sections 50(a)(6)(L) and 50(a)(6)(O) allow as great a variation in monthly payments as the Cerdas' loan provides.

Great care is required when we interpret article XVI, section 50 of the Texas Constitution because of the harsh consequences that follow from its violation, *see* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x), and the broad reach of the section, *see, e.g.*, James W. Paulsen, *Acquiring Separate Property on Credit: A Review and Proposed Revision of Texas Marital Property Doctrine*, 37 ST. MARY'S L.J. 675, 679–80 & nn. 12–13 (2006) (reviewing government estimates of scope of home equity lending following the section 50 amendment and concluding that as many as fifteen percent of Texas homeowners have loans governed by section 50(a)). In the past, we have not hesitated to certify questions concerning the proper interpretation of this provision. For example, in 1999, in *Stringer v. Cendant Mortgage Corp.*, 199 F.3d 190, 191–92 (5th Cir. 1999), we certified the question of whether, where the notice provision of the amendment conflicted with the substantive rights provision on the question, a lender could permissibly require a borrower to pay off third-party debt with the proceeds of the loan. A few months later, the Texas Supreme Court explained that the substantive provisions control over the notice provisions. *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 357-58 (Tex. 2000). In 2001, in *Doody v. Ameriquest Mortgage Co.*, 242 F.3d 286, 290 (5th Cir. 2001), we certified the question of

whether a lender may bring itself into compliance with the three percent fee cap of section 50(a)(6)(E) by subsequently refunding the excess portion of the fee to the borrower. Later that year, the Texas Supreme Court answered that a timely refund cures the violation. *Doody v. Ameriquest Mortgage Co.*, 49 S.W.3d 342, 345–47 (Tex. 2001). Most recently, in 2005, in *Norris v. Thomas (In re Norris)*, 413 F.3d 526, 530 (5th Cir. 2005), we certified the question of whether a houseboat is a homestead under sections 50 and 51 of article XVI. The Texas Supreme Court responded that a boat could not be a homestead. *Norris v. Thomas*, 215 S.W.3d 851, 852 (Tex. 2007). Indeed, certification from this court has generated much of the Texas Supreme Court's jurisprudence concerning section 50.

The majority's holding on this issue in this case has the potential for a much greater impact than those issues presented in *Stringer*, *Doody*, or *Norris*. In contrast to those cases, this case effectively adjudicates the validity of thousands of adjustable-rate home equity loans originated between at least the 1997 enactment of the amendment and the 2004 effective date of the regulations that now provide a safe harbor.

Certification is, of course, discretionary both by our court in certifying and the Texas Supreme Court in accepting the question. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 487 (5th Cir. 2003); TEX. R. APP. P. 58.1. Undoubtedly, construction of a state constitution in a case of first impression is the type of matter appropriate for certification. In such an area, we have generally declined to exercise that discretion only where the controlling state law issues presented by the case are, though "important and complex, . . . sufficiently clear." *Id.* That is patently not the case here. Rather, we are faced with two provisions of the Texas Constitution that four Texas administrative agencies acknowledged are "ambiguous" when read together. *See* REGULATORY COMMENTARY 8.

The majority resolves this ambiguity by relying upon prior non-binding

28

agency determinations.  Admittedly, however, we have no case law whatsoever construing these sections or resolving this ambiguity.  Were the provisions in question clear, I would have no hesitation in following the agency determination which, prior to 2004, is entitled to some, though not controlling, deference.  *See Tex. Bankers Ass'n v. Ass'n of Cmty. Orgs. for Reform Now* (*ACORN*), 303 S.W.3d 404, 408–09 (Tex. App.—Austin 2010, pet. filed) (holding that the constitutionally-authorized regulatory interpretations of article XVI, section 50 are "'entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute'" (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)); *Stringer*, 23 S.W.3d at 357 (characterizing the Regulatory Commentary as "advisory and not authoritative" but looking to it as "support[ing]" the court's conclusion).  However, here, the construction of "substantially equal" payments to mean only "all payments that are not balloon payments" is arguably contrary to the plain language of the section.  *See, e.g.*, *Moore*, 845 S.W.2d at 823; *see also LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) ("When interpreting the Texas Constitution, we 'rely heavily on its literal text and must give effect to its plain language.'" (quoting *Stringer*, 23 S.W.3d at 355)).

The majority's approach is certainly plausible.  But section 50(a)(6)(L) can easily be read to bar more than simply balloon payments: indeed, the language is much broader than the straightforward 1994 federal statutory language that does expressly prohibit only balloon payments.  *Compare* TEX. CONST. art. XVI, § 50(a)(6)(L) *with* 15 U.S.C. § 1639(e) ("No balloon payments.  [Certain] mortgage[s] . . . having a term of less than 5 years may not include terms under which the aggregate amount of the regular periodic payments would not fully amortize the outstanding principal balance.").  The Cerdas' loan, if enforced as written, would allow payments ranging from $2,950 to almost $5,000 per month over the course of the loan.  It is difficult to reconcile the plain English-language

meaning of "substantially equal payments" with such huge variations.   It is hard to imagine how, if the Texas legislature were to disagree with the majority's reading, the provision even *could* be rewritten to, in fact, require substantially equal payments.

The danger of such wide fluctuations is real, as evidenced by the recent "subprime mortgage meltdown" during which the so-called "payment shock" from sharp increases in variable interest rates *did* result in many homeowners across the country losing their homes.  *See, e.g.*, Andrew J. Ceresney, Gordon Eng & Sean R. Nuttall, *Regulatory Investigations and the Credit Crisis*, 46 AM. CRIM. L. REV. 225, 261 (2009) ("One of the more common complaints . . . concerns homeowners confronted with 'payment shock' regarding adjustable rate mortgages . . . .  Often these loans were originated with very low 'teaser' rates . . . during the first few months of the mortgage; at the end of the low interest-paying period, however, the rates reset at substantially higher rates, leaving homeowners unable to afford monthly payments and placing them at risk of foreclosure."); Bernhard Grossfeld & Hansjoerg Heppe, *The 2008 Bankruptcy of Literacy: A Legal Analysis of the Subprime Mortgage Fiasco*, 15 LAW & BUS. REV. AM. 713, 722–29 (2009).[1]

When the plain language of the section is viewed through the prism of Texas's conservatism on home equity lending in light of the state's long history of "carefully protect[ing] the family homestead from foreclosure," *see LaSalle Bank*, 246 S.W.3d at 618, the Cerdas' argument that "substantially equal" means only small variations are permitted in the monthly payments seems at least equally plausible to the meaning advanced by the lender and adopted by the majority, perhaps more so.  Indeed, the relationship between "payment shock"

---

[1]  Although the change from one month to the next in the Cerdas' loan is more gradual than may occur with the so-called "teaser rates" – where originally very low rates are suddenly raised precipitously – the contemplated payments are not "substantially equal" as that term would be understood by a layperson.

and Texas's historical desire to protect the homestead is especially (though not exclusively) relevant to home equity loans, which are, by their nature, more likely than purchase money loans to be made to borrowers on fixed incomes for whom increases in monthly payments are particularly problematic. *Cf.* Kristine M. Young, Note, *The Aging Population and Maturing Mortgage Loans: Ensuring a Secure Financial Lifeline for the Elderly Through Mortgage Lending*, 16 ELDER L.J. 477, 487–91 (2009) (expressing concern that variable-rate mortgages are likely inappropriate for older borrowers with significant home equity but living on fixed incomes).

This question thus is one of the few examples of "genuinely unsettled matters of state law" where certification is most appropriate. *See Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1247 (5th Cir. 1997); *see also De Checa v. Diagnostic Ctr. Hosp., Inc.*, 967 F.2d 126, 129 (5th Cir. 1992) (certifying a question of Texas law where there was "an apparent conflict between" multiple provisions of the same statute). The majority's decision—as would be any decision on this point by a federal court at this juncture—is an "*Erie* guess" that is just that: a guess. It is, moreover, a guess as to a proposition of state constitutional law that potentially affects the rights of thousands of Texas homeowners and their lenders and noteholders.

Accordingly, I respectfully submit that the appropriate course of action on this issue would be to certify the question to the Texas Supreme Court, and I dissent from the majority's decision not to do so.